## BOARD OF SUPERVISORS OF MADISON COUNTY v. A. M. PAXTON.

1. CHANCERY PLEADING. *Answer. Negative pregnant. Exception.*
   A denial of a charge in a bill based upon all the circumstances of time and place mentioned therein, although bad pleading, cannot be treated as an admission, but must be reached by exception to the answer.

2. COUNTY RAILROAD BONDS.  *Innocent purchaser.  President of road.*
    The president of a railroad company is not an innocent purchaser of
    bonds issued in aid of the railroad by the board of supervisors of a
    county in violation of the Constitution and the statute which author-
    ize their issuance only upon condition that two thirds of the legal
    voters of the county shall vote in favor thereof, if he receives them
    as bound to do under the charter, although he passes them to a cred-
    itor with notice, and takes them back as an individual purchaser.

3. SAME.  *Estoppel to deny validity.  Receipt of stock.  Paying interest.*
    The county is not estopped to maintain a bill to enjoin him from dis-
    posing of the bonds and cancel them, by the acts of the board of
    supervisors in assuming control of the railroad stock received there-
    for, and levying taxes and paying the interest on the bonds.

APPEAL from the Chancery Court of Warren County.

Hon. UPTON M. YOUNG, Chancellor.

*F. B. Pratt*, for the appellant.

1. Upon the face of the answer, the allegation of notice in
the bill must be taken as confessed. *Mead* v. *Day*, 54 Miss.
58. There is no denial of the facts stated in the bill, which
tend to show knowledge. All the attempted denials are gen-
eral and evasive, are literal as laid in the bill, and are nega-
tives pregnant. While in form they negative the statements
of the bill, they imply an affirmation thereof. At most they
are ambiguous in meaning, and that construction should be
adopted which is most unfavorable to the pleader. Stephens's
Pl. 379, 382. Upon the pleadings alone the appellant is en-
titled to a decree. No exception for insufficiency was neces-
sary. Denials in the answer must be positive, direct and cer-
tain, and of the substance of the allegation ; not literally as the
charge is laid in the bill, and not by way of negative pregnant.
Story Eq. Pl. §§ 582, 584, 585.

2. The appellee had the burden of proof to show that he
had no knowledge of the facts which rendered the bonds
void, and he has made no effort whatever to show want of
notice. Illegality being admitted, it was incumbent on him
to show that he did not receive the bonds under circumstances
which create suspicion that he knew the facts which impair
their validity. 1 Dan. Neg. Inst. § 815 ; 2 Greenl. Evid.
§ 172 ; *Hamilton* v. *Marks*, 63 Mo. 167. Fraud being estab-
lished as to a negotiable instrument, the holder must exon-

erate himself from all participation in, or knowledge of, the fraud, or he can have no right in law or equity to recover. *Munroe* v. *Cooper*, 5 Pick. 412; *Vallett* v. *Parker*, 6 Wend. 615. In *Smith* v. *Sac County*, 11 Wall. 139 (a county bond case), it was held that the burden of proof is upon the holder of the bond when fraud or illegality is shown.

3. Under the circumstances of the case, notice is affirmatively shown. As president of the company it was his duty to investigate the facts connected with the bonds. If he did his duty, he knew the facts. *Cass County* v. *Green*, 66 Mo. 498, was a suit by the county against a banker who had purchased bonds of the county illegally issued, and circumstances much less strong than those in the case at bar, were held sufficient to charge him with notice of the irregularity. Whatever is sufficient to satisfy the jury that the purchaser acted in bad faith or was wilfully blind to the defect in the bonds, will warrant the inference that he had actual notice of the facts. Wade on Notice, § 88. In *Goodman* v. *Simonds,* 20 How. 343, 367, it is said that while the purchaser of negotiable paper is not bound to inquire, yet he must not wilfully shut his eyes to means of knowledge which he knows are at hand.

4. No authority supports the doctrine that the °county is estopped to deny the validity of county bonds as against a purchaser with notice, except the case of *Shoemaker* v. *Goshen,* 14 Ohio St. 569, in which the court says, that knowledge on the part of the holder will not defeat the estoppel. But this was a mere dictum, as the question was not involved in the case. Upon this question, it will be noticed that the defendant purchased the bonds in controversy immediately after they were delivered to the railroad company, so that no interest had been paid upon these particular bonds. Again, it cannot be said that the defendant took the bonds in controversy upon the faith of the acts of the board of supervisors, for he shows by his answer that he took them in payment of advances made to the contractors, and further shows that the contractors were dependent upon the bonds for their pay. Hence, we may conclude that Paxton took the bonds from the contractors because he could get nothing else, and not because he relied upon the acts of the board of supervisors.

*Cowan & McCabe*, for the appellee.

1. The appellee had no notice, at the time he purchased the bonds in controversy, that they were not authorized by a vote of the electors of Madison County. The facts to be determined are, did he have actual knowledge of their illegality at the time he purchased them, or was he willfully blind to their illegality, and did he act in bad faith. *Swift* v. *Tyson*, Redf. & Big. Lead. Cas. on Bills of Exchange and Promissory Notes, 208; *Goodman* v. *Simonds*, Ib. 239. He acquired the bonds before their maturity. The presumption is that he became proprietor for value in the due course of business. The bonds are negotiable by delivery. Possession invests the holder before maturity *prima facie* with the immunities of a purchaser without notice. *Commissioners* v. *Bolles*, 94 U. S. 104; *Steines* v. *Franklin Co.*, 48 Mo. 167; *Flag* v. *Palmyra*, 33 Mo. 440; *Shoemaker* v. *Goshen*, 14 Ohio St. 569; *Atchison* v. *Butcher*, 3 Kansas, 104; *Commissioners* v. *Clark*, 94 U. S. 278; *Murray* v. *Lardner*, 2 Wall. 110; *Vicksburg* v. *Lombard*, 51 Miss. 111; *Cutler* v. *Board of Supervisors*, 56 Miss. 115. *Prima facie* the defendant's title is good, and in order to overcome this *prima facie* title, so as to let in defences between the original parties, the complainants must impeach his title. The *onus* is on the county of Madison, in this case, to adduce the facts to produce that result. There is nothing to show actual knowledge of the fact which it is claimed invalidates these bonds. There are some allegations in the bill, which show that the defendant was willfully blind, and that he acted in bad faith in the purchase. But these charges are specifically negatived in the answer, *ipsissimis verbis*, only using the negative form of expression. The denials of notice in the answer must be taken as evidence. *Brooks* v. *Gillis*, 12 S. & M. 538; *Miller* v. *Lamar*, 43 Miss. 383. When the answer is sworn to, and is responsive to the bill, it cannot be overturned; except by the testimony of two witnesses or one witness and corroborating circumstances. *Nichols* v. *Daniels*, Walker, 224; *Parkhurst* v. *McGraw*, 24 Miss. 134. The rule is applicable in this case for the reason that the bill is sworn to by an attorney not of his knowledge, but on information and belief. *Jacks* v. *Bridewell*, 51 Miss. 881. The positive statement of the

defendant, made under oath, that he did not know of the facts which invalidated the bonds in this case at the time he purchased them, and that he is a *bona fide* holder of the same for value, stands unassailed by any evidence. The board of supervisors, whose duty it was to decide the matter, decided that two-thirds of all the legal voters of the county had voted to authorize the issuance of the bonds. This was an official act, of which the defendant had knowledge at the time he purchased the bonds. The board levied a tax, and paid the interest. It was not his duty as president to look further than this. He was bound to presume that the board decided properly, and he swore that he did so presume, and acted upon their determination. He never heard of the defect in the bonds. Knowledge is not brought home to him. Even if he had been put on inquiry, he could have gone no further than the records of the board of supervisors. Apparently all was regular.

2. The county of Madison, by reason of the acts of its officials, is estopped now to set up the illegality of these bonds, or notice of the same, on the part of this defendant. The view which we take of this case renders it unnecessary for us to argue this proposition. We are entitled to an affirmance of the decree on the first branch which we have argued; we will be content therefore with one or two remarks, and the citation of a few authorities. The authorities all agree that a corporation, like an individual, may be estopped by the action of its officials, in certain cases. Some of the authorities put it on the ground that it is for the protection of innocent purchasers. We take the true rule to be that this protection is afforded to the innocent purchaser for the protection of commercial paper. Some of the authorities go so far as to say that purchasers may be protected whether they are innocent purchasers or not. *Rogers* v. *Burlington*, 3 Wall. 654; *Shoemaker* v. *Goshen*, 14 Ohio St. 569.

GEORGE, C. J., delivered the opinion of the court.

On July 21, 1870, the legislature incorporated the Canton and Vicksburg Railroad Company (Acts 1870, p. 205–214), and, in the charter, authority was given to the board of supervisors

of Madison County to subscribe for stock therein, and issue bonds to pay for the same. In pursuance of art. 12, § 14, of the Constitution, the charter required, as a condition precedent to the subscription for stock and making the bonds, that an election should be held, at which two-thirds of "all the legal voters" of the county should vote in favor thereof. In case of a favorable vote, the bonds were to be issued payable to the company or bearer, and by the eighth section of the charter, said bonds were required to be delivered "to the President or Secretary of said Company, for the use of said Company." Afterwards, the name of the company was changed to that of the Canton, Vicksburg and Yazoo City Railroad Company; and some amendments were made to the charter, immaterial to the question raised by the record; and on the thirtieth day of March, 1872, an election was held in Madison County, at which ten hundred and sixty-seven votes were cast for, and seventy-seven votes against, the subscription. The registered vote of the county being about three thousand eight hundred, the board adjudged that two-thirds of the legal votes were cast for the subscription, and thereupon made a subscription to the capital stock of the company of two hundred and fifty thousand dollars; bonds to that amount were also directed to be prepared and executed and placed in the hands of a trustee, to be kept by him and delivered to the company in instalments, when certain conditions relating to the progress of the work on the road were complied with by the company.

The appellee, Paxton, was president of the railroad company from its organization until after his purchase of the bonds in controversy in this suit. About September 11, 1873, an instalment of twenty-five thousand dollars of the bonds were called for by the company, and its vice-president and the contractors for building its road were in the town of Canton for the purpose of receiving them. A bill to enjoin the issue of said bonds, and the fiat of a judge granting the injunction had been prepared by a tax-payer of the county, and an injunction was about to be issued by the clerk of the Chancery Court. The injunction was predicated on the charge that two-thirds of the legal voters of Madison County had not voted for the subscription for stock or issue of the bonds. A compromise

was made between the vice-president and contractors on the
one hand, and the complainant in the injunction bill on the
other, whereby the bill was not filed, nor the injunction sued
out, and the bonds were delivered to the vice-president by the
trustee.    Afterwards, on Jan. 31, and on Sept. 24, 1874, two
other instalments of the bonds of twenty-five thousand dollars
each were delivered to the company.    These instalments were
received by the appellee, Paxton, as president of the railroad
company acting on its behalf.    Of the last instalment, the
three bonds in controversy in this suit were a part.    Paxton
paid these three bonds to a creditor of the company, and re-
ceived them back in payment of a debt due by such creditor
to him.    The board of supervisors, for several years after-
wards, paid the interest on the bonds so issued.    On the third
day of January, 1879, this bill was filed by the board of su-
pervisors of Madison County against Paxton, charging the
illegal issue of the bonds for the want of the two-thirds approv-
ing vote, and alleging his connection with the company as presi-
dent, and charging him also with notice of that illegality ; and
especially with notice of the controversy initiated by the in-
junction suit, and its settlement before alluded to.    The object
of the bill is to enjoin Paxton from negotiating the bonds, and
to have them delivered up and cancelled.    Paxton denies the
knowledge charged, but it is insisted that his denial is by way
of negative pregnant, and that the allegation of the bill on that
point should on that account be taken as admitted.    We think
the answer is liable to the objection, but we do not consider
that it is such fault as entitles the complainant to take the
allegation of the bill as admitted.    It is a denial of the charge,
as made in the bill, basing the denial upon all the circum-
stances of time and place mentioned in the bill, and therefore
bad pleading.    But we think that the complainant should
have excepted, and required a further answer.

This brings us to the very important question, whether Pax-
ton, being the president of the railroad company, and charged
by the charter with the duty of receiving these bonds from the
board of supervisors, and actually receiving them and passing
them off to a creditor of the company, and then receiving them
back, as an individual purchaser, stands in a better relation to

these bonds than the company which he represented ; and whether he can deny the notice, which the law fixes on the company as payee in the bonds, and which it actually had in this case through its vice-president.  It will be noticed that there is no attempt to shelter Paxton's purchase under the rights which the purchaser from the company may have had in case his purchase was *bona fide*.  Paxton does not claim that this purchaser had no notice.  His defence rests solely on the ground that he himself is a *bona fide* purchaser for value. The fact, therefore, that there was a sale by Paxton, as president of the company, to another, who in turn resold to Paxton as an individual, may be eliminated from the case, as it is not of the slightest value in determining the rights of the parties ; and the case may be considered as if Paxton, as president of the company, and by its authority, had made the sale to himself on such terms as were satisfactory to the company. The power of the board of supervisors to issue these bonds was special and limited.  It was no part of their ordinary jurisdiction.  They were not the county of Madison, whose rights were to be affected by their action.  They were not even the legal representatives of the county, except in so far as they pursued strictly the authority conferred on them by the charter of the railroad company, passed in pursuance of the Constitution.  Whatever authority they had was given on a condition precedent, which must have been performed before the power vested.  The performance of the condition precedent was not a mere form, but was of such substance as to have been prescribed by the Constitution itself.  It was no less than the assent of two thirds of the legal voters, presumed to be tax-payers, on whom the burden of payment of the debt to be created must fall.  All that the board did without this assent was mere usurpation, in violation of the Constitution of the State, and, therefore, was binding on no one.  It is undeniable that whoever deals with a special agent, or an agent whose powers depend upon conditions, must inquire into the extent of the authority and see that the conditions exist on which the authority rests.  Wharton on Agency, § 138.  This is the rule when the agent is private, and it applies with especial

force to dealings with public agents, whose powers are defined in the Constitution and laws. Wharton on Agency, § 130. This duty to inquire into the authority of an agent is not measured by considerations solely relating to the validity of his contract as it may affect the interest of the person dealing with him. As thus circumscribed, it is predicable only of contracts in which the person dealing with the agent parts with something in the faith that the principal is responsible for it. In such a case, the failure to inquire into the agent's authority can affect no one but the party guilty of the neglect, and his inability to recover from the principal, though a proper penalty on him for his negligence, in no way wrongs the principal. But where, as in this case, something of value belonging to the principal is to be acquired by the transaction from the agent, which may be lost to the principal, or which may be perverted to the injury of the principal, the duty to inquire into the agent's authority, by the person dealing with him, is owed to the principal. Whoever thus acquires the principal's property wrongfully is bound to make restitution. And this duty to inquire into the agent's authority ought especially to be performed in a case like this, where negotiable paper of the principal is wrongfully issued by the agent, and it may by its wrongful subsequent transfer become binding on the principal.

The railroad company derived its being from a law enacted by a legislature which owed its existence to the Constitution. It had no other life than such as this legislature, acting under the Constitution, imparted to it. By the charter of the company and the Constitution of the State, the board of supervisors were prohibited from issuing the bonds, unless upon the assent, as a condition precedent, of two thirds of the legal voters. What the board of supervisors were thus prohibited from issuing the company was equally prohibited to receive. It was therefore the duty of the railroad company to see, before they received the bonds, that the assent was given. This is clear so far as the rights and duties of the company itself are concerned. But the company was an artificial being. It had no visible existence except through its officers and agents. It could do no act whatever without them. It had no mind to make inquiry or to receive notice, no judgment or will to ac-

cept or reject the bonds, and no hand to take them, except by means of its appropriate officers. If the duty to make the inquiry rested on the company, as we have shown that it did, it could only be performed by its officers or agents, and therefore the duty rested on them. And so resting on them, it must follow that, if its performance would result in actual notice, the officers on whom it rested must be charged with such actual notice. Mr. Paxton was the president of the company, and, as such, was specially authorized by the eighth section of its charter to receive these bonds. He was thus by law made the representative of the company as to its reception of them. He did in fact receive two thirds of all that were ever issued, including the bonds in controversy. He was therefore in legal effect, as to the reception of the bonds and all the duties connected therewith, the company itself. His mind and voice were the mind and voice of the company to make the inquiry as to the legality of the issue of the bonds, and his hand was the hand of the company to receive them. He was therefore under all the obligations that rested on the company to make inquiry as to the power of the board of supervisors to issue the bonds. It is certain from the facts shown in the record that if he had performed this duty he would have acquired, long prior to the issuance of the bonds now in controversy, actual notice of their invalidity. Even if he had not shut his eyes and closed his ears to what was going on around him, he must have acquired a knowledge of the fact that there was no assent of two thirds of the voters of Madison County to the issuance of the bonds. This fact was no secret. It was well known in Madison County, in which about one half the road of the company was located. The vice-president of the company, before any bonds were issued, had notice of the defect in the power of the board of supervisors to issue the bonds; the contractors, who were building the road, also had notice. The vote actually cast amounted to but a little more than one fourth of the legal voters of the county, a disparity readily perceived by any one even slightly acquainted with the current history and resources of the State. Nothing but the most inexcusable neglect and want of attention to his business prevented the president of the company

from actually knowing what seems to have been well known to every one interested in ascertaining the facts. Under these circumstances he cannot be allowed to aver ignorance of the invalidity of these bonds, which as president of the railroad company he illegally received from the board of supervisors, and then, in effect, bought individually from the company. It cannot be allowed that a man, who, as president of a corporation organized under the laws of this State, received bonds of a county issued in violation of the Constitution and the charter of the company, shall have a greater right to the bonds than the company he represented, based on an asserted ignorance of a fact, which as president of the company he was bound to know. That the bonds are illegal and invalid is admitted. They can have imparted to them no force, except in favor of a purchaser for value without notice. To allow Mr. Paxton this privilege would be to allow him to gain a right solely upon the ground of the non-performance of his duty to inquire into the powers of the board of supervisors, — a proposition for which there is no foundation in our jurisprudence.

There is nothing in the estoppel set up, as arising from the acts of the board of supervisors in assuming control of the stock, and levying taxes and paying the interest on the bonds. Whatever force these acts may have in favor of a *bona fide* purchaser of the bonds, it is certain that as to a party charge-able in law with notice of their invalidity, they can only be regarded as additional usurpations by the board of supervisors and additional wrongs to the tax-payers of the county. The fact that the appellee received interest to which he was not entitled rather raises an obligation on him to return it, than establishes a right to demand a further invasion of the rights of the tax-payers of the county.

*Decree reversed and decree here.*